IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 25, 2005

STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v.
M.C.M.M.C. and M.E.C.

Appeal from the Juvenile Court for Sullivan County
No. J29,614     James H. Beeler, Special Judge

No. E2005-00390-COA-R3-PT - FILED SEPTEMBER 7, 2005

This is a parental rights termination case. The father appeals the trial court's decision terminating his parental rights to his three children.  The father argues, *inter alia*, that the evidence preponderates against the trial court's finding that grounds for termination exist and that termination is in the best interest of the children. We conclude that the evidence preponderates against the decision of the trial court and therefore, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed; Case Dismissed**

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

James F. Taylor, Mt. Carmel, Tennessee, for the Appellant, M.E.C..

Paul G. Summers, Attorney General and Reporter, and Amy T. Master, Assistant Attorney General, Nashville, Tennessee, for the Appellee, State of Tennessee Department of Children's Services.

## OPINION

*I.*

This appeal involves the termination of the parental rights of M.E.C. ("Father") to his three children: E.T.N.C.. (born on January 8, 1999), M.E.C., Jr. (born on November 14, 2000), and T.R.M.C. ( born on October 4, 2001).

Father and M.C.M.M.C. ("Mother") were married in July of 1999. On October 25, 2001, while Father was driving a vehicle, accompanied by Mother and their two oldest children, he noticed a police car behind.  Father, who according to his testimony had consumed a quart of beer, got "nervous and paranoid" and tried to outrun the police officer.  A chase ensued and Father drove through a construction zone, ran a red light and his vehicle was struck by another vehicle.

Fortunately, no one was injured. Father attempted to flee on foot, but was apprehended and arrested on multiple charges. While Father was in jail, Mother was arrested on other charges and no one was available to care for the children.

On November 29, 2001, the children were placed in the protective custody of the State of Tennessee, Department of Children's Services based on allegations that the children were dependent and neglected due to their parents' incarceration. After being released from jail, Father and Mother signed a permanency plan on December 19, 2001. The plan required, among other things, that Father and Mother would provide age-appropriate food to their children; maintain adequate housing; provide age-appropriate childcare for the chilren in the parents' absence; meet the children's medical needs; complete parenting classes; attend therapy for parenting skills; complete a parenting assessment; obtain employment; follow the rules and regulations of the court pertaining to their current charges and become law-abiding citizens; have reliable transportation; obtain their GED; work with the Appalachian Non-Custodial Parenting Project; and Father would not use illegal drugs or alcohol and would maintain sobriety. A similar plan was subsequently signed by Father and Mother on November 21, 2002. Referrals were made to various agencies to assist the parties. For a period of time Father complied with the plan. He worked with homemaker services; maintained stable housing; attended and completed parenting classes; obtained employment; got his GED; had an alcohol and drug assessment; and participated in an alcohol treatment program. According to his case worker, he did everything that was asked of him.

However, sometime in mid-2002, things began to unravel for Father when he and Mother began to have marital problems. Father claimed Mother had multiple boyfriends and was out "running the roads." Although Father and Mother were separated, they did not tell this to their caseworker. Father lived in a motel and with friends for several months. Mother and Father were together during visits with their children and the caseworker believed they were still together. On June 22, 2002, Mother called 911 and reported that Father was causing a disturbance. The Kingsport Police Department responded and arrested Father for public drunkenness. The officer's report noted that father had a "strong odor of alcohol about his person[,] unsteady on his feet[,] speech slurred." Father denied being intoxicated and claimed that Mother had him arrested so that he would go to jail and her boyfriend could move into the home. Father was neither tried nor convicted of the charge.

On November 21, 2002, Father pleaded guilty to fourteen criminal charges arising from the October 25, 2001 car chase: evading arrest, driving under the influence, aggravated assault, three counts of reckless endangerment, two counts of child endangerment, obstruction of law enforcement, assault, disregard of road construction signs and barricade, disregard of traffic control signs, possession of open container of alcohol, and violation of the seat belt law. Father began serving a six-year sentence on April 11, 2003 and he was incarcerated at the time of the termination hearing. He anticipated a parole date in January of 2005.

On May 12, 2004, the Department of Children's Services ("DCS") filed a petition to

terminate the parental rights of Father and Mother to their three children. Following a hearing on November 10, 2004, the trial court terminated Father and Mother's parental rights to the children based on the trial court's determination that clear and convincing proof had been presented that there had been substantial noncompliance with the permanency plan by Father and Mother; that the children had been removed from the home by court order for a period of six months; and that Father and Mother had failed to remedy the conditions which led to the children's removal. Father appeals and argues that the trial court erred in terminating his parental rights to his three children. Mother did not participate in the trial and did not appeal.

## II.
### Standards of Review

We review the trial court's findings of fact *de novo* upon the record of the proceedings below, with a presumption of correctness "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *see also Hass v. Knighton*, 676 S.W.2d 554 (Tenn. 1984). There is no presumption of correctness with regard to the trial court's conclusions of law, and those conclusions are reviewed *de novo*. *Jahn v. Jahn*, 932 S.W.2d 939 (Tenn. Ct. App. 1996).

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2059-60 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-579 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001). Although this right is fundamental and superior to claims of other persons and the government, it is not absolute. *State v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988)(*citing Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute. *Id.*

Termination proceedings are governed by statute in Tennessee. Parties who have standing to seek the termination of a biological parent's parental rights must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1). Secondly, they must prove that termination of the parent's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Because the decision to terminate parental rights has profound consequences, courts must apply a higher standard of proof in deciding termination cases. Therefore, to justify termination of parental rights, the party seeking termination must prove by clear and convincing evidence the ground (or grounds) for termination and that termination is in the child's best interest. Tenn. Code Ann. §36-1-113(c)(1); *In re Valentine*, 79 S.W. 3d 539, 546 (Tenn. 2002).

–3–

The heightened burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003) *no appl. perm. filed*, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

Courts terminating parental rights are explicitly required to "enter an order which makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). These specific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals. When a lower court has failed to comply with Tenn. Code Ann. § 36-1-113(k), the appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

### III.
### *Grounds For Termination*

#### *A. Substantial Noncompliance with the Permanency Plan*

The trial court terminated Father's parental rights to his children based on its determination that he had failed to comply with the permanency plan pursuant to Tenn. Code. Ann. § 36-1-113 (g)(2) which provides for termination in the event that:

> (2)There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4[.]

Substantial compliance with the statement of responsibilities in a child's permanency plan is essential. In order for the trial court to terminate parental rights pursuant to this ground, DCS must first demonstrate that the requirements of the parenting plan with which Father is expected to comply are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place; and Father's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. Minor, trivial, or technical deviations from a permanency plan will not be deemed to amount to substantial noncompliance. *In re M.J.B.*, 140 S.W.3d at 665-657.

The trial court made the following findings of fact to support its finding of Father's substantial noncompliance with the plan:

1. Father had continued to consume alcoholic beverages as evidenced by his arrest for public intoxication.

2. Father and Mother were not residing together in the same home, but both were present in the home during visits with the children so as to deceive DCS by giving the false impression that they were living together.

3. Father had not maintained a stable home and tried to resolve the marital problems.

We will discuss each basis of the trial court's decision in turn. The permanency plan dated November 21, 2001 required Father to "not use ... alcohol. He will obtain and maintain sobriety." The revised permanency plan dated December 19, 2002 provided that he would maintain sobriety and attend AA. These requirements were certainly reasonable and related to the conditions that caused the children to be removed from the home given Father's alcohol-involved flight from police which endangered his wife and two children on October 25, 2001.

However, DCS failed to present clear and convincing proof of Father's noncompliance with this provision of the plan. The evidence before the trial court of Father's alcohol usage was a certified copy of a Kingsport Police Department Offense Report dated June 22, 2002 indicating an arrest of Father for public drunkenness and containing statements by the officer. The officer did not testify. Mother, who had called 911, did not testify. No one testified to Father's consumption of alcohol on that date. The June 22, 2002 event is the only incident alluded to at trial of Father's alcohol consumption subsequent to the execution of the permanency plans. The only testimony came from Father who swore that Mother came by his house on that date, claimed she smelled alcohol, went to a neighbor's house, and called the police. He claimed she was "lying on him" to get him "locked up" so she could live with her boyfriend. Father never admitted that he had been drinking alcohol on that day. He had not been tried or convicted of the charges in the 2½ years since his arrest on the charges.

Christie Vaughn, a DCS caseworker who was involved in the case, testified that Mother had told her that Father was drinking alcohol and physically abusing her. It is clear from the transcript of the hearing that the evidence presented regarding Father's alleged drinking consisted of rank hearsay. Although it was not objected to by Father's counsel, we do not consider it appropriate to terminate Father's parental rights based, in part, on hearsay evidence that should properly have been excluded as inadmissible. The trial court's final decree states and finds "[t]hat [Mother] testified that [Father] was abusive in the home when he was intoxicated, which [Father] has denied." This finding is clearly erroneous. The transcript reflects that Mother left the courtroom shortly after the hearing began, did not return, and did not testify. The evidence preponderates against a finding that Father failed to substantially comply with the permanency plan by not maintaining his sobriety.

–5–

The second basis for the trial court's ruling was while Father and Mother were not residing together, but they were together during visits with their children and led DCS caseworkers to believe that they were living together. The permanency plan does not address this issue, and therefore there was no basis for the trial court to conclude that Father had failed to comply with this part of the plan.

The third basis for the trial court's ruling was that Father and Mother had "not maintained a stable home and tried to resolve their marital problems." Father admitted that prior to his serving time for the convictions resulting from the car chase and accident, he spent several months living in a motel and with friends. Father's testimony was to the effect that the primary reason for the unraveling of the marriage, and the consequent instability of his housing situation, was Mother's infidelity and her relationships with various boyfriends. At trial, DCS did not present evidence contradicting this assertion. There is no evidence in the record tending to show that Father has failed to make a reasonable effort to maintain what domestic stability he could. The fact that the marriage effectively fell apart, in the absence of a showing that Father was at fault, is not a sufficient ground for terminating Father's parental rights.

Accordingly, it is our determination that the evidence preponderates against the trial court's conclusion that there was clear and convincing evidence that Father had failed to substantially comply with the permanency plan.

### B. Removal for Six Months and Failure to Remedy Conditions

The second ground relied on by the trial court to terminate Father's parental rights was Tenn. Code Ann. § 36-1-113(g)(3)(A) which provides:

> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

It is not disputed that the children have been removed from the home of Mother and Father by court order for a period of more than six months. It is apparent that the primary condition that

led to the children's removal was the fact that both Mother and Father were incarcerated. The record does not show exactly when Mother was released from jail, although she was not incarcerated at the time of the hearing. But Mother has shown very little interest in her children or in preserving her parental rights in this case. Importantly, at the time of the hearing, Father presented evidence that he had an upcoming parole hearing some two months after the hearing. The trial court itself remarked during the hearing that "he's only got a few months left to finish his sentence." Therefore, the evidence preponderates against a finding that the condition of Father's incarceration was not likely to be remedied "at an early date" so that the children could be safely returned to Father in the near future. Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii).

As regards the other "conditions" which arguably led to the removal of the children, we reiterate the testimony of the DCS caseworker that Father made significant progress in fulfilling the requirements of the permanency plan. Father earned his GED to satisfy the permanency plan. He obtained stable transportation, got a job, and remained employed until the day he began serving his sentence. He participated in and completed parenting and homemaking classes, and alcohol and drug abuse counseling. In short, the evidence demonstrates that Father made considerable efforts to improve himself, his situation, and his parenting skills in furtherance of the permanency plan. The children's appointed guardian *ad litem* recognized this, stating to the trial court as follows:

> Concerning the mother, Your Honor, I believe she walked out, and that shows her position on this case. [Father] decided to stay here and have a trial, and during that trial he got on the witness stand and told his side of the story. Now as Judge, you're to give weight to whoever you see fit, but at this time I'm not sure – I know I need to give an opinion, but one thing that holds me up is that the kids have been away for three years, and that bothers me, but at the same time, [Father] has done, seems to me, whatever he's been asked except for a few instances and that he's trying. The one I found not trying walked out the door. The one that is trying I believe is still here.

> If I can get over the fact that the children have been away for three years, I would be in favor of [Father] getting the kids back, but at this time, that's the only thing holding up my being in his favor.

We hold that the evidence preponderates against the trial court's conclusion that there was clear and convincing evidence that the requirements of Tenn. Code Ann. § 36-1-113(g)(3)(A) were met in this case.

### IV.
### *Best Interests of the Children*

"The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests." *In re Audrey S. & Victoria L.,* No. M2004-02758-COA-R3-PT, 2005 WL 2051286 at *26 (Tenn. Ct. App. M.S., filed Aug. 25, 2005). As this court stated in *In re Audrey S.,*

> In recent years, the Tennessee General Assembly, like other state legislatures, has undertaken to codify the factors that courts should consider when called upon to ascertain a child's best interests in various circumstances. In termination of parental rights cases such as this one, the General Assembly has provided the courts with a non-exclusive list of nine factors to consider. Tenn.Code Ann. § 36-1-113(i). Thus, ascertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests.
>
>        *                *                *
>
> Ascertaining a child's best interests does not call for a rote examination of each of Tenn.Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.,* 2005 WL 2051286 at *27. In this case, DCS presented scant, if any, evidence tending to show that it would be in the children's best interest to terminate Father's parental rights. This is reflected in the guardian *ad litem's* testimony cited above. The foster mother of the children testified that she observed Father's interaction with his children during visitation. She testified that Father "obviously cared, loved them a lot" and that the children seemed to respond well to him. She stated that she did not see anything that caused her to have any concerns about Father's quality of care or interactions with the children. We hold that the evidence preponderates against the trial court's conclusion that there was clear and convincing evidence demonstrating that termination of Father's parental rights would be in the best interests of his children.

*V.*

*Conclusion*

–8–

As this court has noted on prior occasions, "termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and the child involved 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby,* 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn.Code Ann. § 36-1-113(*l*)(1)(2003); *In re M.A.R.*, No. E2005-00255-COA-R3-PT, 2005 WL 1922570 at *5 (Tenn. Ct. App. E.S., filed Aug. 11, 2005). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re A.L.B.,* No. M2004-01808-COA-R3-PT, 2005 WL 1584065 at *7 (Tenn. Ct. App. M.S., filed July 6, 2005).

We hold that the evidence preponderates against the trial court's conclusion that the statutory requirements of Tenn. Code Ann. § 36-1-113(g)(2) and 36-1-113(g)(3)(A) and were demonstrated by clear and convincing evidence in this case. We further hold that the trial court erred in finding that DCS had proven by clear and convincing evidence that termination of Father's parental rights was in the best interests of the children.

Accordingly, for the aforementioned reasons, the judgment of the trial court is reversed and the case is dismissed and remanded for collection of costs. The costs are taxed to the Appellee, State of Tennessee Department of Children's Services, for which execution may issue if necessary.

                                    _____

SHARON G. LEE, JUDGE